# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
# AT NASHVILLE
### Assigned on Briefs August 4, 2009

## MARK ALLEN v. STATE OF TENNESSEE

### Appeal from the Circuit Court for Robertson County
### No. 02-0333A    Michael R. Jones, Judge

### No. M2009-00502-CCA-R3-PC - Filed September 9, 2009

The petitioner, Mark Allen, was convicted of one count of exhibition of materials harmful to a minor, one count of especially aggravated sexual exploitation, and one count of rape of a child, and sentenced to an effective sentence of twenty-four years. He filed a timely petition for post-conviction relief, asserting that trial counsel was ineffective. Following an evidentiary hearing, the post-conviction court dismissed the petition. After our review of the record, we affirm the dismissal.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and J.C. MCLIN, JJ., joined.

Gregory D. Smith, Clarksville, Tennessee (on appeal); and Fletcher W. Long, Springfield, Tennessee (at hearing), for the appellant, Mark Allen.

Robert E. Cooper, Jr., Attorney General and Reporter; Matthew Bryant Haskell, Assistant Attorney General; John Wesley Carney, Jr., District Attorney General; and B. Dent Morriss, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

In the direct appeal of the petitioner's convictions, this court set out the facts upon which he had been prosecuted:

> The victim's mother met defendant Mr. Allen though a friend at work. Because the victim's father lived in Florida and did not have much contact with D.M.,[1] the twelve-year-old victim, D.M.'s mother was hoping that Mr. Allen would be a good male influence for D.M. On several occasions, in the winter of 2001 and spring of 2002, D.M. visited the two defendants, Mr. and Mrs. Allen, at their home.

---

[1] It is the policy of this Court to refer to minor victims by their initials.

In July of 2002, D.M. told his mother that the defendants had been engaging in inappropriate sexual activity with him. The victim's mother called the police. Using a tape recorder given to her by the police, she recorded a telephone conversation between Mr. Allen and D.M. The victim's mother then took this recording to the police. After hearing the recording, Detective Mike Carlisle and a few other officers went to the Allen's home. Mr. Allen signed a consent to search form. The officers found a pornographic videotape described by D.M. as the one he had viewed, other pornographic videotapes, and other sexual paraphernalia. Mr. Allen waived his Miranda rights and was questioned at the Robertson County Sheriff's Office on July 16,2002. The following interview was conducted by Detective Carlisle:

> Carlisle: Today is July the 16th of 2002, it's approximately 6:15 in the afternoon. This is Detective Mike Carlisle along with Mr. Mark Allen. Mr. Allen has agreed to sit down and give me an interview. Mark I believe you have been read your rights and you did sign that, is that correct?
>
> . . . .
>
> Carlisle: OK. Now you're sitting and looking at an offense report that [the victim] had made a report to the Sheriff's office about some inappropriate things going on and I think you want to give your side of the story. Is that correct?
>
> . . . .
>
> Allen: OK. The ugh, the statement that he gives, the complainant stated that he was over at Mark Allen's house a family friend and that he has and that Mr. Allen asked him to look at his porno magazine. I didn't ask him to look at any porno magazines. He actually came across some porno magazines and then he asked you know if he could see them and I was like well no you are too young and I won't tell so on and so on until yes, I did agree to let him look at the porno magazines. Against my better judgment but anyhow. So, ugh, talked about different things to do while having sex, yes we did talk about sex. Uhm, as to how to have it. I don't remember all of that, ugh, that I would make him touch his body in private areas is getting into an area that I want to hold on down 'til. . . .
>
> . . . .
>
> Carlisle: Now let me ask you this while we're, while you're looking at that statement. Did [the victim] at your residence did he look at

-2-

and view pornographic material as far as movies and things like that?

Allen:  I don't know how much. . . .

Carlisle:  I understand. . . .

Allen:  because I was not in the house at all times but ugh . . .

Carlisle:  He did like to watch those types of movies?

Allen:  I think he did, yeah.

. . . .

Carlisle:  The other situation that [the victim] told us about.

Allen:  About me touching him and him touching me?

Carlisle:  Right.

Allen:  Ugh, that did happen.

Carlisle:  That did happen.  Was there mutual oral sex?  Did you place [the victim's] penis in your mouth and did [the victim] place your penis in his mouth?  Even for a slight moment.

Allen:  There was sexual . . .

Carlisle:  But it did happen?

Allen:  Yes.

. . . .

Carlisle: It's sometime, I think you've been knowing [the victim] for approximately two years, is that correct?

Allen:  Yeah.

Carlisle:  You kind of met [the victim] through his mom who you work with at your plant.

Allen:  Right.

Carlisle: Ugh, was there any other situations where you and [the victim] may have got mutual masturbation or anything like that or did all of that happen the same incident that ya'll had the oral sex?

Allen: I think it happened the same incident. I . . .

Carlisle: OK.

Allen: I'm thinking it did.

. . . .

Allen: Well can I say one more thing?

Carlisle: Yes sir you sure can.

. . . .

Allen: Anything that ugh, anything that my wife might have done was total coercion and manipulation on my part.

Also on July 16, 2002, the defendant Mrs. Allen made a written statement. She stated:

Approximately 1 year ago, [the victim], who is a 12 [year old] boy from [ ], stayed at my home in Robertson County Tennessee one Friday or Saturday night. My husband and I and [the victim] were setting in floor [sic] of living room playing cards. [The victim] is always [sic] "that" night wanted to run around the house nude. On that night, both [the victim] and I ended up nude, at some point, I performed Oral Sex on [the victim], my husband was present. Also, I don't recall exactly but I think [the victim] performed Oral Sex on me. Also [the victim] attempted to have sex with me, and he did penetrate me with his penis,. [sic] I don't recall if he penetrated me with his finger or not. That is the only time I ever had sex with [the victim]. A short time later my husband Mark had sex with [the victim] as well. Mark videotaped the sex, I saw the video and Mark was laying down and [the victim] was giving Mark a blow job. I believe the bed was in the living room at that time. The videotape was destroyed "erased" a short time later. [The victim] still today is calling wanting to come back to our home.

-4-

State v. Michelle Allen & Mark Allen, No. M2005-00601-CCA-R3-PC, 2006 WL 618297, at **1-2 (Tenn. Crim. App. Mar. 13, 2006), perm. to appeal denied (Tenn. Aug. 28, 2006).

The petition for post-conviction relief alleged that trial counsel was ineffective for failing to seek a severance of the petitioner's charges from those of his wife; failing to make a "proper legal and factual investigation into the alleged crimes and the circumstances surrounding them"; failing to make a "contemporaneous objection" to the use at trial of the statement of the petitioner's wife, who was his co-defendant; failing to move for a mistrial based upon the prejudicial effect of the statement; failing "to subject the [S]tate['s] case to any meaningful adversarial testing"; failing "to protect the [p]etitioner's rights to confront the witnesses against him"; failing to protect various of his constitutional rights; failing to file a motion to suppress a recording of the telephone conversation between the victim and the petitioner; failing to file a motion to suppress the items seized from the petitioner's home; failing to move that the court require the State to elect which offense it was proceeding on; failing to challenge the indictment on the basis that it did not allege that the petitioner "acted unlawfully and knowingly or with any other intent"; and failing, at the appellate stage, to "contact the petitioner or answer his letters for the purpose of lodging claims that were of a major concern to the petitioner." Additionally, the petition alleged that, for sentencing purposes, the court should have begun at the minimum rather than the midpoint and that the cumulative effect of the errors denied the petitioner his right to a fair trial and effective assistance of counsel, both at trial and on appeal.

At the evidentiary hearing, trial counsel testified that he had been employed by the office of the public defender since 1989 and had been licensed to practice law since 1983, when he was in the Judge Advocate General Corp, working as a military prosecutor. He had "exclusively done criminal defense" since 1994. He estimated that, as defense counsel, he had been involved in 200 to 250 jury trials and had been defense counsel in "about 50 [sex crimes prosecutions] of which 20 to 30 actually went to trial by a jury."

Counsel testified as to his view of the impact of the statement of the petitioner's wife at the trial:

> Very little. It was corroboration of the [petitioner's] confession and it corroborated the 12-year-old boy's testimony. Whether her statement came in or not was, I think, meaningless as to whether or not [the petitioner] was going to be convicted as charged.
>
> . . . .
>
> It was icing on the cake that she corroborated that she saw the videotape that was made of the boy doing sex with [the petitioner]. But we had the boy there on the witness stand saying it happened, and we had [the petitioner's] own written statement in which he stated he videotaped it and showed it to his wife. So if she had never confirmed seeing the tape you still had those two items together.

-5-

Counsel explained that the petitioner and his wife determined that they wished to be tried together:

> I agree that he cannot cross-examine the written statement. The decision had been made to be tried jointly, and the decision was made by each of them that they would not testify and would not present proof.
>
> . . . .
>
> Either one against the other. Or on their own behalf.
>
> . . . .
>
> Q. . . . And I think . . . you agree with me that it denied him, as far as that piece of evidence at least, his right to confront his accuser?
>
> A. When you say denied him, he made the decision not to confront his accuser because the accuser was his wife.

Counsel explained why he did not seek a severance in the cases:

> Q. And then – I mean, you're aware that there are times when it's better to sever defendants?
>
> A. There's times that . . . joinder i[s] mandatory, there's times that severance is mandatory, and then there's times it's optional. This one they were joined for trial, and I believe a mandatory joinder based on the same witnesses, the same transactions, the interlocking statements, the same proof, I think that there would have been no question this was a mandatory joinder.
>
> Q. But isn't it true that tried in this trial were counts where they didn't act in concert?
>
> A. That's correct. The second incident, for example, was strictly [the petitioner] and the boy in which [the co-defendant] was not even present.
>
> Q. And, certainly, that could have been tried separately. I mean, he was convicted of this; was he not?
>
> A. Oh, yes, he was convicted.

-6-

Q. And the joint trial could have well prejudiced the jury against him in this count as well; could it have not?

. . . .

A. My conclusion was that it would have probably been more prejudicial to [the co-defendant] than to [the petitioner] to have additional sex acts that were only within the scope of [the petitioner's] behavior introduced at a trial in which she was also at trial. I did not see anything in her being tried with him that hurt him.

Q. Is it your position today that their being tried together did not in anyway prejudice [the petitioner]?

A. That is correct.

Q. Had they been tried separately and she'd been tried first, wouldn't it have been true that she wouldn't have had a [F]ifth [A]mendment right to protect anymore and you could have called her about the statement that was entered against [the petitioner]?

A. That is correct.

Q. Wouldn't that have caused some prejudice in trying them together? Wouldn't you agree?

A. If she were called as a witness to testify about seeing the videotape; is that the question, or?

Q. Both; the videotape and the statement she gave against [the petitioner], which was admitted at trial and made an exhibit. I mean, this is a videotape that at the time of trial didn't exist?

A. We – it was – it has never been produced and was reported destroyed. I don't know if it was in fact destroyed; it was reported destroyed and was never found.

Q. So the jury was going to be hearing evidence about evidence they weren't going to be seeing; right?

A. Correct.

Q. So they were going to have to rely on people saying that it existed at one time?

A. The [petitioner's] admission that it existed at one time, and the statement of the 12-year-old boy that said he was in the tape, and had seen the tape, and [the petitioner] videotaped him.

Counsel was asked why he did not file a motion to suppress the tape recording of the petitioner's telephone conversation with the victim:

Q. You didn't file a motion to suppress the evidence and have a suppression hearing to determine if he knew it was being recorded?

A. I did not. I know that [the petitioner] has raised that as an issue in post-conviction that under eavesdropping statutes of the [S]tate of Tennessee it requires the consent of one of the parties. And quite frankly, . . . my analysis at the time was [the victim's] mother, since he was [a] minor, was clearly the one who was giving consent to the conversation and, I believe, listening in to the conversation as it was being recorded. Listening to half of the conversation, because she would have been there with her son.

Q. So did you make the judgment that the mother's consenting to it being recorded satisfied the eavesdropping law –

A. That it was –

Q. – or took it out of eavesdropping? Was that the judgment you made?

A. That if [the victim] and/or his mother had consented that was good enough.

Q. Okay.

A. This was not total eavesdropping of a stranger taping what otherwise would have been a private conversation between two people with a reasonable expectation of privacy.

Q. Don't you think that that might have been something that you should have let the [j]udge rule on as opposed to your ruling on it?

A. In hindsight perhaps.

Q. Did you have any opinion as to whether – let's say that recording had not been admitted, would that have had any impact on the outcome in your opinion?

A. In my opinion it would have [had] no impact whatsoever on the outcome. Once the 12-year-old testified, that alone was enough, he was a strong witness; once the videotape was played for the jury that began to establish the nature of the conduct; and then when [the petitioner's] own statement came in, that was three layers of a three layer cake, there was no question that he was going to be convicted as charged.

Counsel explained why he did not file a motion to suppress the search of the petitioner's home:

Q. . . . There was a search of the home in this case; was there not?

A. It was a consent search, yes.

Q. All right. And was there any type of motion to suppress filed to determine whether or not his consent was given freely, voluntarily and knowingly?

A. No motion was filed.

Q. Is that because you had again determined that his will had not been overborne by the Government, that he had freely and intelligently given consent to search, or?

A. There was no evidence that his – which, of course, linked to the statement that he gave as well he was not under arrest. Detective Carlisle used the classic tactic that's being used among our sex offense investigators of telling [the petitioner] the door swings both ways; you're not in custody; you're free to leave at anytime; just trying to get to the facts of what happened; rock him to sleep so he will then make statements, never arrest him, never put handcuffs on him, ask him for permission to search, which the [petitioner] signed and freely admitted that in the closet they're going to find the box of the videos and sex toys.

. . . .

The officer went straight out. There wasn't so much a search as recovering what he knew what was going to be there because [the petitioner] had already told him about it.

Counsel explained why he did not seek an election from the State regarding the charges:

A. And did you make any type of motion at the close of the proof to have the State elect which offense of child rape on which they were relying for unanimous jury

-9-

verdict? Did you ask the State to make any type of election at the close of the proof as to which –

A. With respect to [the petitioner,] there was only one, and that was the . . . videotaped incident.

Counsel testified as to his meetings with the petitioner prior to the trial:

I met with him – he was in custody . . . the whole time, unable to post bail bond. Met with him several times at the Robertson County Jail; we went over the proof, I showed him the statements that would be introduced against him, gave him my candid assessment of the likelihood fo success at tr[ia]l, then the sentencing range that the Court would have to follow if convicted. The – towards the month or so before trial we were heavily involved in settlement negotiations, which were hampered by the fact that [the co-defendant] was also in custody and represented by separate counsel. We were even actually able to arrange a four person meeting where we had [the petitioner and the co-defendant] and . . ., defense counsel, and myself in the jail library for a two client, two attorney face to face meeting in private, and discussed settlement. As of the time they declined all settlement offers and elected to take the case to trial. So there was probably, I'd say, five to seven visits of me and [the petitioner] and then one visit with [the co-defendant] being physically present there.

Counsel explained why he did not make a motion for judgment of acquittal at the conclusion of the trial:

Q. Did you ever ask the Court at the close of the proof to grant the [petitioner] a judgment of acquittal?

A. No, I did not.

Q. Did you ask the Court to dismiss the indictment for the indictments not containing the phrases that the actions were unlawful and knowingly?

A. No. The mens rea, no.

Q. Did you review – you, of course, reviewed the indictment prior to going to trial?

A. I did. The . . . state of the law says that – mens rea, unless it's specifically a requirement of that – required with particularity it need not be in the indictment.

-10-

As for whether he might have sought a mental evaluation of the petitioner, counsel said that he "saw no evidence of diminished capacity, and did not attempt to argue it." He explained his reasoning in this regard:

[W]hat I would look for is any indications of mental illness, mental retardation; evidence, for example, of childhood abuse that would minimize his consciousness of right and wrong. For example, if he had been sexually molested as a child, and was a very young man, an 18 or 19-year-old defendant who was not fully appreciative of the wrongfulness of what he was doing with a 12-year-old.

. . . [The petitioner] was and I think is a very intelligent adult and well aware of the difference between right and wrong, was able to adhere to the right, was able to discuss the case with me, the elements of the offense, the facts as they related to his wife, and likelihood of the sentencing range that he was going to get. We went round and round over sentencing ranges, and he seemed to understand that quite clearly about class felonies and terms of service, noneligibility for parole and so on.

Additionally, counsel explained why he did not seek to prevent the jury from hearing the statement of the petitioner's wife:

I knew there was going to be no cross-examination of either one because neither was going to testify, because they were tried jointly the statement would have been admitted against her. Now, whether or not the Court could give a limiting instruction that was only admissible against her, again, to the extent this could have been the . . . statements of coconspirators, in the furtherance of the conspiracy to have sex with a 12-year-old boy, I don't know how the Court would have ruled. It seemed that it would have been admitted in all likelihood, and even if it was not admitted it would not have affected the outcome of the trial. I tend to cut away the fluff and go right for the heart of the trial.

During cross-examination, counsel detailed his understanding of the petitioner's view as the trial was to begin:

He wanted neither him to testify – he did not want his wife to testify, he did not want to call witnesses and he did not wish to present proof; he wished to put the State to its proof, and he said to, basically, accept the verdict of the jury, whatever it was, and accept the sentence of the Court, whatever it was. He wanted to go through the trial.

Counsel told of his discussion with the petitioner regarding whether a motion would be filed to suppress his statement:

I discussed it with him in the sense of asking him, . . . not word for word but it was something like this: At the time that you gave this statement, . . . had you been arrested; no; were you in handcuffs? No. Did the officer tell you you couldn't leave? No, he said I could go. I said well, so you were just brought in and they asked you some questions? And he said yeah. And you cooperated with all that? He says yes. And at that point I said well, I could file a motion to suppress, but it's a loser; it's noncustodial interrogation; there's no obligation that he advise you of your rights. If you freely came down to the police station to answer questions, were free to go, and just decided to tell your side of the story with the tape-recorder going and later write it out I could file a motion to suppress and it will last about two minutes in front of a judge. That's about how my discussion would have gone with that.

Counsel testified as to his advising the petitioner of post-trial procedures:

I met him at the jail after the trial was over, two or three days. After trial I said go ahead back and then we'll come over and I'll talk about it. I laid out what I refer to as posttrial and appellate rights; I said you've got the right to a new trial motion, and if there's a mistake that was made at trial the [j]udge gets first shot at correcting his own mistakes before you're allowed to go up to the Court of Criminal Appeals.

So if a wrong jury instruction was given, or a witness testified who should not have testified, or a witness was not allowed to testify, I said if there was a mistake made at trial then I have to file something called a new trial motion; I've only got 30 days to do that, and if I don't file the new trial then I cannot appeal because the [j]udge gets first shot at correcting his own mistakes. If your appeal is to the weight of the evidence, the sufficiency of the evidence, then you don't have to file a new trial motion, I can file an appeal straight away.

And so I laid it out and said my deadline basically is 30 days for the new trial motion or I can go ahead and file notice of appeal. He said no appeals; no appeals; I just want to go do my time. How quickly will they ship me to T-D-O-C? I think by that time he had learned the vernacular that shipping is when the body physically goes down to the Department of Corrections, and he said how soon will they ship me, and when will they ship [the co-defendant] in the women's penitentiary? I said I don't know; that's up to . . . the jailer, he handles when the bed space becomes available; no appeals; no appeals. I did not get that in writing. That was a mistake on my part. I will not do that again. But I didn't get it in writing, but he made it clear there was to be no new trial motion, no appeals; he had his trial, he had received his punishment and he wanted to go do it.

Counsel said that "almost within, probably, 30 or 60 days of [the petitioner's] being shipped to the Department of Corrections a letter came bouncing in: What have you done on my appeal;

-12-

where's my appeal?" Counsel said that he "wrote back to [the petitioner] and said you told me don't appeal."

The petitioner testified that he met with trial counsel "[m]aybe five" times prior to the trial. He said that he did not remember counsel "mentioning him filing any motions to suppress anything," or discussing whether the petitioner's statement was admissible. He said that counsel did not discuss with him the circumstances under which his statement had been made. He denied that he told trial counsel not to file a motion to suppress or to limit the evidence. Additionally, he denied that he told counsel that he did not want to have witnesses called at the trial. The petitioner explained what his understanding had been of the appeal process:

> When [trial counsel] described the appeal process to me he told me . . . what would happen, . . . what the appeal process was, . . . he said you're going to say I want a do-over; and what they will do is they will bring everybody back in and we'll have your trial again. And to my knowledge that meant . . . go through the same thing over again; in other words, I didn't know bring the whole jury back in, all the same things, go back through the same thing again. And at that point I did not say I do not want . . . to appeal; I said I do not see any point in doing that again. I assumed it would be the same outcome because of the way the appeal process . . . was told to me I didn't understand that.

The petitioner explained the circumstances under which his statement was taken:

> There was another detective present at that time, and I don't know what his name was but he spoke to me as well. His name has never come up in the trial or – any time. But I was told by the detectives, Detective Carlisle and . . . the other detective, that if I would just cooperate that they would do what they could for me. That they would – it was an offer of hope. And prior to me even making the statement when I mentioned the fact about getting a lawyer they seemed to insinuate that for me to get a lawyer –
>
> . . . .
>
> They said . . . it wasn't Detective Carlisle[,] it was the other detective, I don't know what his name was, he stated that there are 200 and . . . ever how many inmates at the Robertson County Jail who thought they needed a lawyer.

The petitioner said that he did not think his statement could be used against him because the detectives told him that "it was a statement and not a confession." The petitioner said that he did not ask to be tried with his wife:

> I don't remember wanting to be tried so I could be there with my wife; of course, I like to be in the presence of my wife as much as possible, but I assumed that

-13-

[trial counsel] would do what was best on my part as to whether to try me with her or not. . . . I didn't know anything about the law and I was depending on [trial counsel] to handle that and to know what to do . . . in that case. So I – and he seemed to want to go forward as – in a joint trial[.]

The petitioner said that a mental evaluation would have shown "whether [he] was mentally in the right mind at the time of giving [his] statement." He said that at the time of making his statement, he was "in shock," and an evaluation "could have proved it could be possible that [his] mental stability at the time that they brought [him] to the courthouse was such that [he] could be coerced."

The petitioner said that, on the day his house was searched, "four, five cars, several detectives, several officers" came, and he explained why he gave his consent to the search:

And I assumed that their search and coming to search my home had to do with the phone conversation that I had received, and I felt that it was – pretty much be useless for me to try to . . . not allow them to search; they seemed to say . . . they'd get a warrant . . . if I didn't sign the search they'd just need – they'd have to go get a warrant; I was just saving them some trouble. And I assumed at that point that they would get the warrant, and that's why I allowed them to search the home.

During cross-examination, the petitioner acknowledged that, on the way to the sheriff's office, he had not been handcuffed, had ridden in the front passenger's seat of the officer's car, and, after making a statement, had returned to his home. On redirect examination, the petitioner said that, while he was at the sheriff's office, he did not feel free to leave.

Detective Mike Carlisle of the Robertson County Sheriff's Department testified that, from interviewing the victim, he learned there were evidentiary items in a closet at the petitioner's house. Before going to the petitioner's home, he listened to a taped telephone conversation between the petitioner and the victim. He said that he and Lieutenant Bennett went to the petitioner's home, introduced themselves, and "told him [they] were looking for some child porn that possibly could be in his home." The petitioner told the officers that "there were some sex toys there but that was . . . for his wife and the parties that they had." Detective Carlisle testified that they had neither an arrest warrant nor a search warrant and that the petitioner signed a consent to search his residence. The petitioner did not request that they produce a search warrant and was not told that, unless he consented, they would obtain a search warrant.

After the petitioner consented to the search, the detectives proceeded to a bedroom closet where the victim told them that child pornography was located and found the item in a box in the closet. The petitioner was asked if he would accompany the officers to the sheriff's department and give a statement. Detective Carlisle described the petitioner's response: "He agreed; he got in the front seat of my unmarked patrol car without any handcuffs on, and I drove to the sheriff's office, and there I s[a]t down and interviewed him."

-14-

Detective Carlisle said that the petitioner was not under arrest at the time. He said that the petitioner was advised of his Miranda rights, which he appeared to understand. The petitioner did not object to giving a statement, and Detective Carlisle told of the statement he made regarding an attorney: "The only thing said about an attorney was when I was reading his right[s] and, of course, that states if you want an attorney and can't afford one that the state will furnish one."

Detective Carlisle said that after the petitioner gave his statement, he was transported back to where his wife had left her car. He said he told the petitioner that the "case would be presented to the Grand Jury" and that if he cooperated, Carlisle would tell the district attorney that he had done so.

During cross-examination, Detective Carlisle said that he gave the recording equipment to the victim's mother, who knew the conversation was being recorded. He said that when they went to the petitioner's residence, there were four detectives, including himself, and "one or two marked patrol cars." He said that he told the petitioner at the sheriff's office that he was not under arrest, and he did not hear him say that he wanted an attorney. Detective Carlisle testified that he did not make a statement to the petitioner regarding inmates at the jail who wanted lawyers and did not hear any others make such a statement.

Lieutenant Donald Bennett of the Robertson County Sheriff's Department testified that he went to the petitioner's home, along with Detective Carlisle and other officers. He said that he explained to the petitioner why they had come to his home, their intentions, and "the type job" they did. He said that, as he talked about the case, the petitioner had "an appearance of remorse" and was "cooperative." Bennett sat in the front seat of his vehicle with the petitioner and reviewed the consent to search form with him. He said that he allowed the petitioner to read the form, discussed it with him "briefly," and the petitioner then signed the form. He denied telling the petitioner that officers would obtain a search warrant if he refused to sign the consent form. He said that he did not participate in the taking of the petitioner's statement after the petitioner went with Detective Carlisle to the sheriff's office. He said that he did not hear the petitioner ask for an attorney while they were at the sheriff's office.

## ANALYSIS

### I. Ineffective Assistance of Counsel

We have set out the petitioner's claims that trial counsel was ineffective. The State responds that the petitioner was provided the effective assistance of counsel and argues, further, that this appeal should be dismissed because the notice of appeal was not timely filed.

As the State correctly points out, while the post-conviction court's findings of fact was entered on September 5, 2007, the notice of appeal was not filed until February 12, 2009.[2] Pursuant to Rule 4, Tennessee Rules of Appellate Procedure, a notice of appeal shall be filed within thirty days after entry of the judgment from which an appeal is sought. In criminal proceedings, however, the notice is not jurisdictional. Accordingly, this court may review untimely appeals and determine whether the notice requirement should be waived. Tenn. R. App. P. 4. Waiver is not automatic and should only occur when "the interest of justice" mandates waiver. To hold otherwise, by summarily granting waiver whenever confronted with untimely notices, renders the thirty-day requirement a legal fiction and circumvents the rule. See Michelle Pierre Hill v. State, No. 01C01-9506-CC-00175, 1996 WL 63950, at *1 (Tenn. Crim. App. Feb. 13, 1996), perm. to appeal denied (Tenn. May 28, 1996).

We note that appellate counsel was not appointed until July 11, 2008. In view of that fact, and the seriousness of the charges of which the petitioner was convicted, we conclude that, in the interest of justice, we should waive the late filing of the notice of appeal.

In order to determine the competence of counsel, Tennessee courts have applied standards developed in federal case law. See State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The United States Supreme Court articulated the standard in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984), which is widely accepted as the appropriate standard for all claims of a convicted petitioner that counsel's assistance was defective. The standard is firmly grounded in the belief that counsel plays a role that is "critical to the ability of the adversarial system to produce just results." Id. at 685, 104 S. Ct. at 2063. The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id. at 687, 104 S. Ct. at 2064. The Strickland Court further explained the meaning of "deficient performance" in the first prong of the test in the following way:

> In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. . . .

---

[2]We note that, on April 24, 2009, this court entered an order allowing the petitioner to supplement the record with the order of the post-conviction court which denied the petition. Subsequently, the April 14, 2009, order of the post-conviction court denying the petition was filed with this court. For purposes of this opinion, we have considered the post-conviction court's findings of fact and conclusions of law entered on September 5, 2007, as being dispositive of the petition.

No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.

Id. at 688-89, 104 S. Ct. at 2065. The petitioner must establish "that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms." House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (citing Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996)).

As for the prejudice prong of the test, the Strickland Court stated: "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694, 104 S. Ct. at 2068; see also Overton v. State, 874 S.W.2d 6, 11 (Tenn. 1994) (concluding that petitioner failed to establish that "there is a reasonable probability that, but for counsel's errors, the outcome of the proceedings would have been different").

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697, 104 S. Ct. at 2069; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

By statute in Tennessee, the petitioner at a post-conviction relief hearing has the burden of proving the allegations of fact by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f) (2006). A petition based on ineffective assistance of counsel is a single ground for relief, therefore all factual allegations must be presented in one claim. See Tenn. Code Ann. § 40-30-206(d).

We note that when post-conviction proceedings have included a full evidentiary hearing, as was true in this case, the trial judge's findings of fact and conclusions of law are given the effect and weight of a jury verdict, and this court is "bound by the trial judge's findings of fact unless we conclude that the evidence contained in the record preponderates against the judgment entered in the cause." Black v. State, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, 104 S. Ct. at 2066, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The fact that a strategy or tactic failed or hurt the defense does not alone support the claim of ineffective assistance of counsel. See Thompson v. State, 958 S.W.2d 156, 165 (Tenn. Crim. App. 1997). Finally, a person charged with a criminal offense is not entitled to perfect representation. See Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). As explained in State v. Burns, 6 S.W.3d 453, 462 (Tenn. 1999), "[c]onduct that is unreasonable under the facts of one case may be perfectly reasonable under the facts of another."

## A. Trial Counsel's Decision Not to File Motions in Limine or to Sever

The post-conviction court found without merit the petitioner's claim that counsel was ineffective because these motions were not filed:

> The better practice may have been to file a [m]otion to [s]ever or a [m]otion in limine in reference to the [co-defendant's] statement. The court would have required the [S]tate to elect whether to sever the defendants or to redact [the co-defendant's] statement. Considering either alternative, there was no harm to the petitioner. The statement of [the co-defendant] did not provide any evidence that had not been provided in the petitioner's statement; her statement was more specific only. Based on the petitioner's instruction concerning the trial of the case and his statement that he wanted to protect [the co-defendant], [trial counsel] did not have the opportunity to move to sever the petitioner's trial from the trial of [the co-defendant]. Even if [trial counsel] had done so and the court had granted the motion, the proof was overwhelming and beyond any doubt that the petitioner committed all of the crimes charged.

As to this claim, the post-conviction court accredited the testimony of trial counsel as to his instructions from the petitioner and concluded that even if counsel had been ineffective in this regard, the petitioner was not prejudiced, given the weight of the evidence against him. The record supports this determination.

## B. Counsel's Decision Not to File Motion to Suppress Telephone Conversation

The petitioner argues that trial counsel should have moved to suppress the recorded telephone conversation between the victim and the petitioner.

The court found this claim to be without merit:

> The petitioner alleged that [trial counsel] was ineffective by failing to move to suppress the telephone conversation between the victim and the petitioner. This is entirely without merit. From the court's memory of the tape recording, it is obvious that the victim knew that his telephone conversation was being recorded. It was not ineffective assistance of counsel not to file such a frivolous and merit less [sic] motion.

The record supports this determination.

## C. Counsel's Decision Not to File Motion to Suppress Evidence from Petitioner's Residence

The petitioner argues that trial counsel should have filed a motion to suppress the evidence seized from his home.

The post-conviction court determined that this claim with without merit:

> The petitioner alleged that [trial counsel] was ineffective for failing to file a motion to suppress the evidence seized from the search of his home. The petitioner failed to provide [trial counsel] with any reason to file any motion to suppress. Not until the petitioner was in the penitentiary did he state Detective Bennett threaten[ed] him with a search warrant. The court finds that the testimony of Detective Bennett is credible and that he did not threaten the petitioner with a search warrant.

The record supports this determination.

### D. Counsel's Decision Not to Seek Election of Offenses

The petitioner criticized the fact that trial counsel did not seek to require the State to elect which offense was being prosecuted.

The court concluded that this claim was without merit:

> The petitioner alleged that [trial counsel] was ineffective by failing to require the [S]tate to elect whether it was "my mouth to his privates/or his mouth to my privates." Even if counsel should have done so, looking at all of the evidence it is incomprehensible that there was any harm to the petitioner. The victim testified that both events occurred during the same episode. The petitioner's statement was that both occurred during the same episode. All of the evidence is the same. There is absolutely no way that the outcome of the trial would have been different.

The record supports the court's determination that the petitioner was not injured by this action.

### E. Counsel's Decision Not to Challenge Superseding Indictment

The petitioner argued that trial counsel should have challenged the superseding indictment as he had the original one.

The court determined that this claim was without merit:

> The petitioner alleged that [trial counsel] was ineffective for failing to challenge the indictment o[n] the ground that it was defective. Apparently the petitioner must be referring to Count 7 of the original indictment. Count 7 alleged that [the petitioner] did promote, employ, use, assist, transport or permit a minor to participate in the performance or in the production of material which included the minor engaging in mutual sexual activity, to wit: oral intercourse with [the petitioner]. Tennessee Code Annotated [section] 39-13-522 requires a mens rea of

knowingly. The court has researched this contention and determined that by reading the entire count, the element of "knowingly" is necessarily implied by the words "with [the petitioner]." This is similar to knowing possession of [a] controlled substance with intent to sell. It is necessarily implied. It was not ineffective assistance of counsel for [trial counsel] not to move to dismiss this count.

The record supports the determination of the post-conviction court.

### F. Failure of Appellate Counsel to Respond to Petitioner's Letters

The petitioner complains that appellate counsel did not respond to the petitioner's letters to him.

The court concluded that this claim was without merit:

The petitioner has alleged that his appellate counsel, . . ., was ineffective by maliciously failing to contact the petitioner or answer his letters concerning the appeal. The petitioner has failed to establish that he had any grounds that had any merit. Appellate counsel has the duty to present those issues for appeal that he believes should go forward. [Appellate counsel] was not ineffective.

The record supports the post-conviction court's determination that the petitioner failed to prove that he was prejudiced in this regard.

### G. Counsel's Decision Not to Seek Mental Evaluation of Petitioner

During his testimony, the petitioner explained, as we have set out, why he believed that counsel should have sought a mental evaluation.

The post-conviction court concluded that this claim was without merit:

The petitioner alleged as a new issue that counsel was ineffective by failing to have him evaluated in reference to the statement the petitioner made apparently referring to the statement given to Detective Carlisle. The petitioner presented no evidence that one could reasonably believe to be related to this issue. There was no evidence presented that the petitioner had any mental illness or deficiency of any kind. This issue has no merit.

Thus, the post-conviction court concluded that the petitioner had failed to prove "that counsel was ineffective or failed to meet the standards required." As we have stated, the record supports the findings of the post-conviction court as to each of the claims of the petitioner, and we conclude that it supports this claim as well.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the dismissal of the petition for post-conviction relief.

_____
ALAN E. GLENN, JUDGE